ADR
E-FILING

ORIGINAL

**FILED**

MAR 24 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



1  Laurence M. Rosen, Esq. (CSB# 219683)
   THE ROSEN LAW FIRM, P.A.
2  333 South Grand Avenue, 25th Floor
   Los Angeles, CA 90071
3  Tel: (213) 785-2610
   Fax: (213) 226-4684
4  Email: lrosen@rosenlegal.com

5  Additional Counsel on Signature Page

6

7                    BY FAX

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

8

9

10  JAMES WANG, INDIVIDUALLY AND ON     ) Case No.:
11  BEHALF OF ALL OTHERS SIMILARLY      )
    SITUATED,                           )  CV 11 - 01415
12                                      )
              Plaintiffs,               )  COMPLAINT FOR DAMAGES,
13                                      )  INJUNCTIVE RELIEF AND
         vs.                            )  RESTITUTION
14                                      )
                                        )  CLASS ACTION
15  OCZ TECHNOLOGY GROUP, INC.,         )
16                                      )
              Defendant.                )  JURY TRIAL DEMANDED
17

18        Plaintiff James Wang, individually and on behalf of all other persons similarly situated,

19  by his undersigned attorneys, alleges in this Complaint the following upon knowledge with

20  respect to his own acts, and upon facts obtained through an investigation conducted by his

21  counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by OCZ

22  Technology Group, Inc. ("OCZ" or the "Company") with the United States Securities and

23  Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents

24  and statements relevant to the instant action; (c) review and analysis of the marketing materials

25  utilized by defendant in connection with the marketing and sales of the products subject of the

26  Complaint; (d) information readily obtainable on the Internet; and (e) interviews of witnesses

27  with personal knowledge of the relevant facts.

28

---

1

**CLASS ACTION COMPLAINT**

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Additional facts supporting the allegations contained herein are known only to defendant or are exclusively within its control.

## I.   NATURE OF THE ACTION

1.   This is a class action on behalf of a class consisting of all persons and entities, other than defendant OCZ and its officers and directors, who purchased within the United States certain solid state drives ("SSDs") marketed and sold by OCZ under the model names "Vertex 2" and "Agility 2" (collectively, the "Products") between January 1, 2011 and the present (the "Class Period")[1], seeking to recover damages caused by defendants' unlawful conduct and violations of various California consumer protection laws (the "Class").

2.   OCZ is a Delaware corporation that maintains its principal place of business in San Jose, California.  OCZ produced, labeled, advertised, promoted, offered for sale, sold and distributed the Products to the general marketplace.

3.   Prior to the beginning of the Class Period, OCZ marketed a line of SSDs using the Vertex 2 and Agility 2 monikers.  Along with the model name, OCZ identified the storage capacity of these drives as either 50GB, 60GB, 80GB, 90GB,100GB, 120GB, 160GB, or 180GB. OCZ further advertised the expected data transfer rates of these devices.

4.   On or about January 1, 2011 – the beginning of the Class Period – OCZ made material alterations to the mix of physical components used in the Vertex 2 and Agility 2 line of products by reducing the type and quantity of flash memory that was used in each device.  Not surprisingly, this change in production reduced the price of the inputs, and therefore the cost of production of the units, by not only using a cheaper type of flash memory but also fewer physical chips per unit.

---

[1] Because defendants' deceitful conduct involved a material alteration to a product that was already present in the market, it is unknown when the Products were first introduced to the market.  This information is known by defendant and Plaintiff will file amended pleadings to conform the Class Period with the evidence obtained through discovery.  The complete class definition is set forth in Section V.

**CLASS ACTION COMPLAINT**

5.     These changes materially altered the characteristics of the Products and made them materially distinct from the previous models.  In summary, the new units were materially slower and had less storage capacity.

6.     Despite these material alterations, OCZ failed to disclose these changes to consumers and continued to use the same marketing and advertising statements, including Product packaging, used to market the previously manufactured units.    In fact, the representations concerning the capacity of the Products no longer followed industry or OCZ's own standards.

7.     Due to the material alterations in the product, the statements made by OCZ in advertising and marketing the Products were materially false and misleading, and give rise to the claims asserted herein.

8.     Had Plaintiff and the Class members known of the true facts about the Products, they would either have not purchased them, or would have not purchased the Products at inflated prices.

## II.     JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).   The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and members of the class of plaintiffs are citizens of a state different from defendant.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that many of the acts and transactions giving rise to this action occurred in this district and because defendant:

a.     is authorized to conduct business in this district and has intentionally availed itself of the laws and markets within this district through the promotion, marketing, distribution and sale of its products in this district;

b.     does substantial business in this district; and

c.     is subject to personal jurisdiction in this district.

## III.     PARTIES

11.     Plaintiff James Wang was at all relevant times and is a resident of Snohomish County, Washington.  During the Class Period, Plaintiff purchased an SSD marketed by OCZ as

3

**CLASS ACTION COMPLAINT**

1   a 120GB Agility 2, model number OCZSSD2-2AGTE120G. At all relevant times herein,

2   Plaintiff was exposed to and saw OCZs claims about the Products, the capacity of the Products,

3   and the numerous third party reviews and testimonials utilized by OCZ in the marketing and

4   sales of the Products.  Particularly, in making his purchase, Plaintiff saw and relied upon the

5   marketed storage capacity of the Products as well as the performance of the Products.   Plaintiff

6   did not receive the full value of the product as marketed by OCZ.

7          12.    Defendant OCZ is a Delaware corporation that is duly licensed to conduct

8   business in California, and maintains its principal executive offices at 6373 San Ignacio Avenue,

9   San Jose, California.  OCZ markets, distributes and sells memory modules and SSDs, including

10  the Products, throughout California and the United States.    OCZ's advertising and

11  representations about the Products made to consumers is conceived, reviewed, approved or

12  otherwise controlled from its headquarters in California.  Beginning in 2009, the Company's

13  product mix became significantly more weighted in the sale of SSDs.  The sale of SSDs is now

14  the central focus of the Company's business, and in 2010, the Company announced that it was

15  discontinuing its memory module product line.  The Company anticipated that sales from its

16  SSDs would account for nearly 80% of the Company's revenue for its fiscal year 2011.

17  **IV.    FACTUAL ALLEGATIONS**

18         13.    OCZ produced, labeled, advertised, promoted, offered for sale, sold and

19  distributed the Products to the general marketplace throughout California and the United States.

20  Among the products marketed, distributed and offered for sale by OCZ are SSDs, including the

21  Products.

22         14.    An SSD is a type of non-volatile digital data storage device.[2]  Similar in purpose

23  as the hard disk drive ("HDD"), SSDs are functionally distinguished by the use of flash memory

24  chips for the storage of information as opposed to magnetic rotating platters that are used in

25  traditional HDDs.

26

27

---

[2]  Other types of non-volatile digital storage include magnetic tape, floppy disks, and optical discs, e.g., cd-rom and
dvd-rom.

28

4

**CLASS ACTION COMPLAINT**

15.    An SSD is largely comprised of a three basic components: (1) flash memory which stores the data; (2) a controller which manages the reading and writing from/to the flash memory; (3) a circuit board which serves as the physical foundation of the flash memory and controller, as well as the relay between these various components and the host interface which serves as the input/output agent that hands off the data to other components to reach its ultimate destination, the requesting component, eg., a processor. The circuit board can also contain other components that assist the functioning of the device, such as cache or capacitors.

16.    SSDs are marketed and segmented in a manner similar to HDDs. The manner in which HDDs are segmented and marketed has a long history upon which SSDs marketing is based, and has formed the basis of expectations on which consumers rely in making purchases of SSDs.

17.    OCZ does not directly design or manufacture any of the components comprising the SSDs that they market and distribute. Rather, they source components from various vendors of the components and have those components assembled by a third party into the final product that is then marketed and distributed by OCZ under the OCZ brand name.

18.    OCZ is not the only company that is in the business of sourcing these key components from third parties, having them assembled, and then marketing and distributing them under a particular brand name.

19.    In fact, due to the nature of the business, and the role that OCZ plays, there is a tremendous amount of competition and commoditization among the various products offered by OCZs competitors.

20.    This commoditization is compounded by the current state of the SSD market, the importance of the controller to the functioning of an SSD, and the limited number of competing controllers.

21.    The Products use the same controller designed and sold by SandForce, Inc.[3] This same controller is utilized in SSDs from a vast number of vendors whose businesses operate in a

---

[3] The Agility 2 and the Vertex 2 utilize a SandForce SF-1200 controller. The Vertex 2 has a firmware which enables a higher number of random write operations when writing 4kb data block. The difference could also be characterized as the Agility 2 having an artificial handicap implemented through the software in the firmware for

**CLASS ACTION COMPLAINT**

1  similar manner as OCZ, including Corsair, G.Skill, Adata, MicroCenter, Mushkin, OWC, Patriot

2  Memory, Super Talent, Viking, and Zalman, among others. Reflecting the common business

3  operations, many of these competitors also share presence in the retail memory modules market.

4       22.     There are two key generic characteristics, or specifications, which largely define

5  the manner in which an SSD is marketed and advertised: (1) storage capacity; and (2)

6  performance. These two specifications are also the key characteristics considered by the

7  consumer when deciding which SSD to purchase and how much they are willing to pay for such

8  an SSD.

9       **Storage Capacity**

10      23.     The advertised storage capacity is the key differentiator between SSD

11  segmentation.

12      24.     Storage capacity plays a particularly important part in differentiation in the SSD

13  market due to the high costs of the storage capacity per dollar. While HDDs are typically sold

14  for $0.10-0.15 per gigabyte, a gigabyte of storage provided by an SSD is frequently more than

15  $4.00 per gigabyte (per the manufacturer's suggested retail price ("MSRP"). When initially

16  launched, in April 2010, the MSRP of the Agility 2 was $204.99 for a 50GB version, $379.99 for

17  the 100GB, and $719.99 for a 200GB version. The Vertex 2 was $219.99, $399.99, and

18  $769.99, respectively. At the time, HDD manufacturers were advertising and selling 2048GB

19  HDDs for less than $150.00.

20      25.     Given the significant cost per gigabyte, the advertised capacity of an SSD is a

21  material piece of information considered by consumers when deciding which unit of the same

22  brand to purchase. Likewise, the capacity is a material piece of information considered by

23  consumers when deciding which brand to purchase because, as set forth above, there are

24  numerous competitors that each offer what is essentially an identical product, eg., an SSD using

25  a Sandforce SF-1200 controller with 60GB storage capacity.

26

27

28  purposes of market segmentation. For purposes of the claims, these distinctions between the Agility 2 and the
    Vertex 2 are irrelevant.

**CLASS ACTION COMPLAINT**

26.     Due to the relatively small storage capacity of these drives, every gigabyte of storage space is material and can dictate whether a drive is going to be useable by the end user. As such, consumers are sensitive not only due to the price per gigabyte, but due to the fact that the limited space can dictate the usability of the drive.

27.     Prior to the distribution of the Products, OCZ marketed the capacity of its SSDs in a historically consistent manner that followed the traditional standards used in the marketing of HDDs and that was also aligned with the standards established by the International Disk Drive Equipment and Materials Association (IDEMA). In essence, the advertised capacity was the capacity that was user accessible.

28.     The Products, and predecessor units of the Products, are marketed and advertised using the brand names "Vertex 2" and "Agility 2." These drives use a different controller, the SF-1200, that materially altered the performance and interaction with the flash memory as compared to previous SSD models marketed by OCZ. The SF-1200 reserves for its own use one flash memory module. The flash memory reserved by the controller is not user accessible. Accordingly, OCZ originally marketed the capacity of this line of SSDs to take this fact into account – consistent with the standards traditionally used in marketing HDDs and standards set by IDEMA. For example, an OCZ Vertex 2 advertised with the capacity of 60GB was advertised as such to reflect the user accessible capacity that resulted from the drive having 64GB worth of raw capacity minus the 4GB (one memory module) reserved for use by the controller.

29.     OCZ abandoned the IDEMA standard and its own marketing and advertising practices with the introduction of the Products.

**Performance**

30.     A consumer largely decides to pay over $4.00 per gigabyte of storage instead of $0.10 per gigabyte for one primary reason – performance.

31.     Consequently, performance, typically advertised through various measurements of transfer rates, is the centerpiece to the marketing and advertising of an SSD. Read and write latency is also an import performance advantage provided by an SSD over the traditional HDD

7

**CLASS ACTION COMPLAINT**

1  which experiences significant delays, compared to an SSD, as a result of the time to seek for data

2  on a rotating platter.

3      32.     This performance is largely determined by the controller. The quality, and

4  quantity, of the flash memory used also impacts performance.

5      33.     In fact, so important are the performance measurements that OCZ, and its

6  competitors, segment their various branded offerings through the performance that will be

7  provided. For example, the Agility 2 and Vertex 2 should maintain an expected level of

8  performance depending on storage capacity advertised.

9      **The Products – Before and After**

10     34.     This action arises from OCZ's continued use of marketing materials that were

11 made false and inaccurate as a result of OCZ making material alterations to the physical

12 products. As a result of these changes, the Products substantially decreased in performance and

13 storage capacity compared to the units that had previously been manufactured. Despite the

14 material changes in the characteristics of the drive, OCZ continued to market and advertise the

15 altered products using the same advertising scheme and specifications characteristic of the

16 previous units, including the packaging for the Products. Consequently, the advertising and

17 marketing materials were false, misleading, and failed to disclose material facts otherwise

18 necessary to properly describe and market the Products.

19     **Storage Capacity – Before and After**

20     35.     Prior to the material alteration in the components comprising the Products, OCZ

21 marketed the predecessor units as having storage capacity of 60GB, 80GB, 90GB, and 120GB.

22 And, in fact, the user accessible storage capacity was 60GB, 80GB, 90GB and 120GB,

23 respectively.

24     36.     This marketing of the capacity was consistent with standards established by the

25 International Disk Drive Equipment and Materials Association (IDEMA) and the manner in

26 which OCZ had historically marketed the capacity of the SSDs it offered to the marketplace.

27     37.     The user accessible capacity was made apparent through the prominent role it

28 played in the advertising and marketing of the Products.

8

**CLASS ACTION COMPLAINT**

38.     OCZ model numbers were based, in part, on the amount of user accessible storage capacity.  The 60GB models had "60G" in the model number, 80GB models "80G", 120GB models "120G", etc. This alone made the user accessible storage capacity self-evident.

39.     The packaging also dominantly displayed the user accessible storage capacity on the front of the box, be it "60GB", "80GB", or "120GB."

40.     OCZ further advertises the range of capacities of the different models of the SSDs it sells and markets, by associating groupings of storage capacities with certain performance expectations.  In the same product pages, OCZ links to an extensive amount of online reviews performed on the Products.  These reviews reiterate the model of the Products being tests and the respective user accessible storage capacity.

41.     OCZ's distribution and retail partners further provide the capacity of the Products in each of their marketing materials and informational pages.  These capacities are listed in the same uniform manner that the capacities for competing SSDs and traditional HDDs are displayed and described.

42.     Immediately prior to the beginning of the Class Period, OCZ directed that the Products be manufactured using a different quantity of flash memory chips as well as a different type of flash memory than the units that had previously been marketed under the Vertex 2 and Agility 2 brand name.

43.     For example, the 60GB version of the Vertex 2 originally used sixteen 4GB flash memory modules.  After the manufacturing change, the 60GB version utilized only eight 8GB memory modules of a higher density.

44.     As set forth above, the particular controller used in the Products reserves for its own use one memory module. For example, prior to the material alterations, this amounted to 4GB for a 60GB Vertex 2 or Agility 2.  After the material alterations, the reserved amount of flash memory increased, e.g., to 8GB for a 60GB model.

45.     Consequently, and because of the material alterations introduced in the Products, the user accessible capacity declined as a result of the increase in the memory reserved by the controller.  For example, the user accessible capacity of the Vertex 2 and Agility 2 drives

9

CLASS ACTION COMPLAINT

1  marketed as 60GB decreased from 60GB to approximately 55GB. The 120GB drives decreased

2  from a user accessible capacity of 120GB to 115GB.

3      46.    OCZ has acknowledged that the IDEMA capacities of the Products, e.g., 55GB,

4  are lower than the representations of capacity contained in its advertising and marketing

5  statements, eg. 60GB.

6      47.    OCZ failed to disclose the material changes in the capacity of the Products in its

7  advertising, marketing and promotional materials, including the packaging for the Products. In

8  fact, OCZ continued to use the exact same advertising scheme and marketing materials as it had

9  with the original Vertex 2 and Agility 2 units. The Products continue to include the same model

10 number scheme and maintain the same specifications on OCZ's product webpages. OCZ also

11 continues to link to awards and reviews of the original units.

12     48.    By doing so, OCZ's advertising and marketing statements were false and

13 misleading concerning material characteristics of the Products.

14 **Performance – Before and After**

15     49.    The material alterations to the Products described above also resulted in

16 significantly decreased drive performance – especially with respect to the Products' write speeds.

17     50.    This decrease in performance is the result of the two alterations introduced into

18 the Products. First, the Products use flash memory that was manufactured using a 25 nanometer

19 (nm) manufacturing process instead of a 34-nm manufacturing process used to produce their

20 predecessor models. However, the reduced size of the Products' memory cells makes them more

21 prone to errors, and increases the amount of error correcting computations that must be

22 performed by the Products' SandForce controller. This increase in controller processor load leads

23 to a dramatic decrease in the Products' write speeds, with a number of benchmarks indicating, on

24 average, a 25% drop in performance.

25     51.    Secondly, OCZ opted to use high density chips that allowed OCZ to use fewer

26 chips per product. However, the reduced number of chips alters the efficiency in which the

27 controller can transfer data among the chips.

28

10

**CLASS ACTION COMPLAINT**

52.    Notably, these changes provided economic savings to OCZ as a result of a lower price for each memory chip and the (option to) use of fewer flash memory chips in the Products.

53.    These material alterations resulted in a decrease in the performance of the Products as compared to the predecessor units.  For example, performance of the Products' sequential and random reads was measured to be approximately 15-20% slower than the predecessor units.   The performance of the Products' sequential and random writes was measured to be 35-60% slower than the predecessor units.  This is particularly gross as the performance begins to fall below that of much cheaper standard HDDs. The transfer rates while copying files was measured to be 40-45% slower than the predecessor units.  Input/Output Operations Per Second (IOPS), a popular measurement of read/write performance that is used on the packaging of the Products was found to be 26% slower than the predecessor units in certain situations.

54.    The packaging of the Products advertises the expected performance of the Products by listing several measurement results, including expected maximum read and write performance, expected sustained write performance, and 4KB random writes IOPS.

55.    In addition, OCZ maintains a webpage dedicated solely to the marketing and advertising of the Products.  Each webpage (Vertex 2 and Agility 2) contains performance measurements for the Products.  Each also contains links to numerous third party reviews conducted by technology and computing enthusiasts, and lists numerous awards and quotations lauding the Products.

56.    The Products fail to perform to the specifications advertised on OCZ's packaging and other marketing and advertising materials.  The reviews, awards and links also constitute false advertising because the manner in which they are linked create a false impression concerning the expected performance of the Products.  In short, the Products are simply not the products being promoted and advertised by OCZ.

57.    The statements and representations used in the marketing and advertising of the Products, based upon the same packaging materials, website materials, and links and references to reviews and tests performed on the preceding units, were therefore false and misleading.

11

**CLASS ACTION COMPLAINT**

58.     OCZ had full knowledge that the Products were materially different than the original units that its ongoing advertising and marketing materials were based.  OCZ designed and caused to be manufactured the original units.  Having altered the selection of components for use in the Products, and causing the Products to be manufactured, OCZ was aware that the user accessible capacity had decreased in the Products.

59.     OCZ would have also become aware of the material change as a result of the routine internal review and examination of the Products to ensure fitness for distribution.

60.     OCZ was further aware that the marketing and advertising of the Products was inconsistent with its own current and past practices.  This is highlighted by the fact that on numerous prior occasions,  OCZ has altered the advertised capacity to reflect changes in the implementation that altered the user accessible capacity, e.g., increasing advertised capacity from 50GB to 60GB, and 100GB to 120GB when the reserved space decreased.

61.     Reflecting this knowledge, OCZ offered to retailers two different implementations of the Vertex 2 and Agility 2 – one similar to the predecessor units and the Products.  OCZ has acknowledged, through its agents and employees, that retailers opted to carry the Products.  Yet, despite offering the two distinct implementations and the material differences between the units in capacity and performance, the advertising, packaging, and marketing materials of the two implementations were identical, and the same as that used to market the units preceding the Products.

62.     Rather than truthfully advertise the product, OCZ opted to quietly distribute the materially altered units using the previously used advertising and marketing platform on unsuspecting consumers.

63.     OCZ has publicly acknowledged, through its agents and employees, that consumers, such as Plaintiff and the members of the Class, had no way of discovering the differences between the Products and the units as advertised and initially manufactured short of purchasing a unit.  In fact, OCZ has published a software tool that users can run to determine which unit they have (outside of simply examining the user accessible capacity).

**CLASS ACTION COMPLAINT**

64.     During the relevant period, OCZ, through policies established with certain of its retailers, also prohibited the return of these products once purchased.

65.     Given the commoditization of SSDs, had consumers been truthfully informed, consumers would have either opted to purchase units similar to the initial iteration of the Vertex 2 and Agility 2 as offered by its competitors, or would have demanded lower prices before purchasing the Products.

66.     Plaintiff purchased an OCZ SSD in reliance upon the deceptive advertising and marketing materials utilized by OCZ in marketing the Products.

67.     Plaintiff received a product that had lower user accessible capacity and inferior performance than what was advertised by OCZ.

68.     Plaintiff was damaged thereby as a result of receiving a product that was not as advertised, and was inferior to that which was advertised.

## V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this lawsuit on behalf of himself and the proposed Class members under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure. The proposed Class consists of:

> All persons and entities, other than Defendant OCZ and its officers or directors, who purchased within the United States one or more solid state drives ("SSDs") marketed by OCZ under the model names "Vertex 2" and "Agility 2" with storage capacities of 180 gigabytes ("180GB") or less[4] and received SSDs that used 25nm flash memory chips resulting in either (a) a user accessible capacity lower than that which was advertised; or (b) performance lower than that which was advertised (collectively, the "Products") between January 1, 2011 through present (the "Class Period")[5]

---

[4] This includes OCZ model numbers 60 gigabytes ("60GB"), 80 gigabytes ("80GB"), 90 gigabytes, 120 gigabytes ("120GB"), 160 gigabyte ("160GB") or 180 gigabytes ("180GB") including OCZ model numbers OCZSSD2-2AGTE120G, OCZSSD2-2AGTE60G, OCZSSD2-2AGT120G, OCZSSD2-2AGT60G, OCZSSD2-2VTXE60G, OCZSSD2-2VTX80G, OCZSSD2-2AGT80G, OCZSSD2-2VTX90G, OCZSSD2-2VTXE90G, OCZSSD2-2VTXE120G, OCZSSD2-2VTX60G, OCZSSD2-2VTX120G, OCZSSD2-2VTX160G, OCZSSD2-2VTXE160G, OCZSSD2-2VTX180G, and OCZSSD2-2VTXE180G,

[5] Because the alterations made to the Products was not disclosed to the public, it is unknown when the Products were first introduced to the market. This information is known by defendant and plaintiff will file amended pleadings to conform the Class Period with the evidence obtained through discovery.

13

**CLASS ACTION COMPLAINT**

70.     The Class comprises many thousands of consumers throughout California and the United States. The Class is so numerous that joinder of all members of the Class is impracticable. There are questions of law and fact common to the Class. The common questions include:

a.  whether OCZ had adequate substantiation for the Products claims prior to making them;

b.  whether the claims by OCZ concerning the storage capacity and performance of the Products are true, or are misleading or reasonably likely to deceive;

c.  whether the material alteration of the components constituting the Products by OCZ , and concealment of such constituted a fraud on consumers;

d.  whether the alleged conduct violates public policy or constitutes violations of the laws asserted herein, including California Business and Professions Code §17500, *et seq.* by engaging in misleading or deceptive advertising; California Civil Code §1750, *et seq.*, by engaging in unfair or deceptive trade practices; California Code §1790, *et seq.*, by breaching express and implied warranties; and Business and Professions Code §17200, *et seq.*, by engaging in unfair, unlawful and/or fraudulent business practices;

e.  whether plaintiff and the Class members sustained monetary or other loss and the proper measure of that loss;

f.  whether plaintiff and Class members are entitled to an award of punitive damages; and

g.  whether plaintiff and Class members are entitled to declaratory or injunctive relief.

71.     Plaintiff's claims are typical of the claims of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class.

72.     Plaintiff does not have any interests antagonistic to those of the Class. Plaintiff has retained competent counsel experienced in the prosecution of this type of litigation.

73.     The questions of law and fact common to the Class members, some of which are set out above, predominate over any questions affecting only individual Class members.

14

**CLASS ACTION COMPLAINT**

74.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. The trial and the litigation of Plaintiff's claims are manageable.

75.     Unless a class is certified, Defendant will retain monies received as a result of its conduct that was taken from Plaintiff and proposed Class members.

### FIRST CAUSE OF ACTION
**Deceptive Advertising Practices**
**(California Business & Professions Code § 17500, *et seq.*)**

76.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

77.     Beginning prior to the start of the Class Period, January 1, 2011, and continuing to present, OCZ engaged in advertising and marketing to the public, including the Class, and offered the Products for sale throughout the United States.

78.     OCZ engaged in broad-based advertising and marketing efforts with the intention of inducing Plaintiff and the public to purchase the Products

79.     OCZ's advertisements and marketing representations concerning the storage capacity and performance of the Products are false, misleading and deceptive as alleged herein.

80.     OCZ also knowingly concealed, suppressed and consciously omitted material facts to Plaintiff and other members of the Class knowing that consumers would rely on the advertisements and packaging to purchase the Products.

81.     At the time OCZ made and disseminated the statements alleged herein, it knew or should have known that the statements were untrue or misleading, and acted in violation of Bus. & Prof. Code §17500, et seq. by issuing them nonetheless.

82.     The foregoing acts, omissions and practices directly, foreseeably and proximately caused Plaintiff and other members of the Class to suffer an ascertainable loss and damages in the form of, *inter alia*, paying more money for the Product than they would have, and/or by purchasing the Product which they would not have purchased, if the benefits of taking the

Product had not been misrepresented, in amounts to be determined at trial. Plaintiff and Class members are entitled to restitution, disgorgement, injunctive relief and all other relief allowable under §17500, et seq.

## SECOND CAUSE OF ACTION
### Unfair Business Practices
### (California Business & Professions Code § 17200, *et seq.*)

83.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

84.     OCZ's conduct, as alleged herein, constitutes unfair competition within the meaning of Bus. & Prof. Code § 17200, *et seq.*

85.     Specifically, OCZ business activities of selling the Products through the use of untrue and misleading advertisements and marketing violated numerous laws governing OCZ's conduct, as cited herein, and including, among others, Civ. Code §§1572 (fraud), 1709-1710 (willful deception to alter position); 1770(a)(5), 1770(a)(7) and 1770(a)(9) (CLRA violations).

86.     Plaintiff and the Class have suffered injury in fact and lost money or property as a result of such unfair competition.

87.     Plaintiff, on behalf of himself and the Class seek an order of this Court awarding restitution, disgorgement, injunctive relief and all other relief allowed under §17200, et seq., plus interest, attorneys' fees and costs pursuant to, *inter alia*, C.C.P. §1021.5.

## THIRD CAUSE OF ACTION
### Negligent Misrepresentation

88.     Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

89.     As set forth above, OCZ misrepresented to Plaintiff and each Class Member by means of its advertising, marketing and other promotional materials, the purported storage capacity and performance of the Products.

90.     OCZ made the misrepresentations herein alleged with the intention of inducing Plaintiff and the public to purchase the Products.

16

## CLASS ACTION COMPLAINT

91.    Plaintiff and Class members saw, believed, and relied on OCZ's misrepresentations and, in reliance on them, purchased the Product.  Said reliance was reasonable, given OCZ's clout and generally good reputation among consumers.  Plaintiff and the Class were without the ability to determine the truth of these statements on their own and could only rely on OCZ's statements in its advertising, marketing and other promotional materials and the Product's label.

92.    At the time OCZ made the misrepresentations herein alleged, it lacked a reasonable basis for believing the representations to be true.

93.    As a proximate result of the foregoing negligent misrepresentations by OCZ, Plaintiff and the Class members were induced to spend an amount to be determined at trial on the Products and were deprived of a product that provided the storage capacity and performance represented by OCZ.  Accordingly, and as a proximate result of OCZ's misrepresentations set forth herein, Plaintiff and Class members lost the money they paid for the product in an amount to be determined at trial in that it did not have the qualities they sought, which OCZ represented to them that it had.  Had Plaintiff and the Class members known of the true facts about the Products, they would either have not purchased them, or would have not purchased the Products at inflated prices.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty in Violation of
### Cal. Civ. Code § 1790 *et seq.* (Song-Beverly Consumer
### Warranty Act) and Cal. Comm. Code § 2313)

94.    Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth here.

95.    Plaintiff, and each member of the Class, formed a contract with defendant at the time Plaintiff and the other members of the Class purchased the Product. The terms of that contract include the promises and affirmations of fact made by OCZ on its Product labels and through its marketing materials and campaign, as described above.  This product labeling and advertising constitutes express warranties, became part of the basis of the bargain, and is part of

17

**CLASS ACTION COMPLAINT**

a standardized contract between plaintiff and the members of the Class on the one hand, and OCZ on the other.

96.    All conditions precedent to OCZ's liability under this contract have been performed by Plaintiff and the Class.

97.    OCZ has breached the terms of this contract, including the express warranties, with Plaintiff and the Class by not providing the product which could provide the benefits represented as described above.

98.    As a result of OCZ's breach of its contract, Plaintiff and the Class have been damaged in the amount of the purchase price of the Products.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment

99.    Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth here.

100.    As set forth above, OCZ made false representations to the Plaintiff and the members of the Class in order to induce each of them to purchase one of the Products.

101.    Plaintiff and Class members purchased at least one of the Products in reliance upon OCZ's misrepresentations.

102.    Plaintiff and the Class members did not receive all of the benefits promised by OCZ, and OCZ was able to obtain payments for the Products in an amount greater than it otherwise could have.

103.    It would be inequitable for OCZ to retain the excess profit it obtained from its deceptive and unlawful conduct.

104.    Accordingly, Plaintiff and the Class should be awarded restitution in the amount by which OCZ has been unjustly enriched, including, without limitation, all profits obtained by OCZ from its unlawful conduct.

## SIXTH CAUSE OF ACTION
### Violation of the California Consumers Legal Remedy Act, Civ. Code §1750, *et seq.*

18

**CLASS ACTION COMPLAINT**

105.   Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth here.

106.   Plaintiff and the members of the Class are consumers who purchased the Products for personal and/or commercial use.

107.   OCZ engaged in deceptive practices, unlawful competition practices and/or unfair acts as defined by Civ. Code § 1750, et seq. ("CLRA") to the detriment of Plaintiff and members of the Class who suffered harm thereby, as set forth herein.

108.   OCZ willfully and knowingly caused harm to Plaintiff and the Class by utilizing false and misleading statements in the marketing, advertising, and promotion of the Products. By this conduct, OCZ violated the following provisions of the CLRA:

(a) Civil Code § 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have.

(b) Civil Code § 1770(a)(7): Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another.

(c) Civil Code § 1770(a)(9): Advertising goods or services with intent not to sell them as advertised.

109.   Pursuant to Civ. Code § 1780(a), Plaintiff seeks an order enjoining Defendant from engaging in the methods, acts or practices alleged herein.

110.   Irrespective of any representations to the contrary in this Class Action Complaint, Plaintiff specifically disclaims, at this time, any request for damages or restitution under any provision of the CLRA.

111.   Plaintiff, on behalf of himself and the Class, has notified OCZ of the alleged violation of the CLRA, as required by Civ. Code § 1782(a). If OCZ does not rectify its illegal acts within 30 days of the notice, Plaintiff intends to amend this Complaint to seek relief pursuant to Civ. Code §1780 for actual damages, restitution, punitive damages, attorneys' fees and costs; and other relief that this Court deems proper.

**CLASS ACTION COMPLAINT**

112.   In accordance with Civ. Code § 1780(d), Plaintiff annexes hereto a declaration establishing that venue is proper because Defendant's principal place of business is located in San Jose, California, in the county of San Jose. Plaintiff's declaration is annexed hereto.

## RELIEF SOUGHT

WHEREFORE, Plaintiff prays for relief and judgment pursuant to the claims other than the claim asserted pursuant to CLRA, as follows:

   a. Determining that this action is a proper class action and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

   b. Awarding actual and compensatory damages in favor of Plaintiff  and the other Class members against Defendant for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   c. Restitution and disgorgement of all amounts obtained by Defendant as a result of its unlawful activities, together with interest thereon from the date of payment, to the victims of such violations;

   d. Awarding punitive damages in favor of Plaintiff;

   e. An Order requiring Defendant to immediately cease its wrongful conduct; enjoining Defendant from selling, directly or indirectly, the Products through the use of false and misleading statements complained of herein; ordering Defendant to engage in a corrective notice campaign; and requiring Defendant to implement a full replacement program of all Products, or, in the alternative and at the preference of Plaintiff and each member of the Class, a refund for the purchased Products; and/or other equitable relief according to proof;

   f. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees, and all applicable interest; and

**CLASS ACTION COMPLAINT**

g.   Such other and further relief as the Court may deem just and proper.

Plaintiff further prays, at this time and subject to amending, for relief and judgment pursuant to the CLRA for an order enjoining Defendant from engaging in the methods, acts or practices alleged herein.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 24, 2011

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen (SBN # 219683)
333 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
Telephone:    (213) 785-2610
Facsimile:    (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com

The Hinton Law Firm
Christopher S. Hinton
275 Madison Ave., 34th Floor
New York, NY 10016
Telephone: (646) 723-3377
Facsimile: (212) 202-3827
Email: chinton@hintonlegal.com

Attorneys for Plaintiff

21

**CLASS ACTION COMPLAINT**